UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

CRYSTAL M. M.,                          )
                                        )
            Plaintiff,                  )
                                        )
    vs.                                 )      Case No. 1:18 CV 194 (JMB)
                                        )
NANCY A. BERRYHILL,                     )
Deputy Commissioner of Operations,      )
Social Security Administration,         )
                                        )
            Defendant.                  )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On April 23, 2015, plaintiff Crystal M. M. protectively filed an application for a period of disability and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*[1] On July 8, 2015, she filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.* (Tr. 162-65). In both applications, she alleged disability beginning on February 21, 2000, which she subsequently amended to January 1, 2013. (Tr. 196). After plaintiff's applications were

---

[1] There are inconsistencies in the record regarding when plaintiff filed her Title II application. The application itself states that plaintiff completed her application on July 1, 2015 (Tr. 160-61), while the Disability Determination Explanation states that she filed it on April 23, 2015. (Tr. 69, 97). In order to be consistent with the decision of the Administrative Law Judge (Tr. 15), the Court will adopt the April 2015 date for the purposes of this Memorandum and Order.

denied on initial consideration (Tr. 69-82, 83-96), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 104-06).[2]

Plaintiff and counsel appeared for a video hearing on March 22, 2017. (Tr. 36-63). Plaintiff testified concerning her disability, daily activities, functional limitations, and past work. The ALJ also received testimony from vocational expert Jennifer Smidt, M.S. The ALJ issued a decision denying plaintiff's applications on September 1, 2017. (Tr. 15-28). The Appeals Council denied plaintiff's request for review on May 31, 2018. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability and Function Reports and Hearing Testimony

Plaintiff was born in May 1977 and was 35 years old on the amended alleged onset date. (Tr. 26). She lived with her husband who was disabled. She completed high school with special education classes.[3] (Tr. 26, 41, 45, 53). She previously worked as a home health aide, a customer service representative, a retail "crew" member, and in fast food. (Tr. 47, 216).

Plaintiff listed her impairments as uncontrolled diabetes, learning disability, clinical depression, neuropathy, and emotional instability. (Tr. 203). In her August 2015 Function Report (Tr. 262-69), plaintiff stated that she was unable to work due to pain in her legs which prevented her from standing for long periods of time, uncontrolled blood sugar which caused her to shake, a learning disability that affected her comprehension of job duties, depression, and panic attacks. Her sleep was interrupted due to pain in her legs and feet. She was unable to

---

[2] Plaintiff filed applications in 2005, 2007, 2010, and 2011 that were denied on initial consideration. (Tr. 70, 84). Plaintiff requested a hearing following the initial denial of her 2007 applications but failed to appear for the hearing. (Tr. 67-68).

[3] Her high school report card shows that plaintiff primarily was placed in general education classes with resource support. (Tr. 330).

count change or handle money.  Her daily activities included fixing meals, watching television, napping, and taking care of a cat.  She listed her hobbies as "reading all the time," relaxing, and watching television.  (Tr. 265).  She relied on her then-fiancé's help to complete laundry, wash dishes and cook meals.  She did not do yard work.  She did not drive due to panic attacks and did not like to go out on her own.  She went shopping once a month, taking five hours to complete the task.  She had to sit to dress.  She could walk from the front door to the kitchen sink before needing to rest for 30 minutes.  She spoke on the phone with family members and only socialized with friends who came to her house.  She had difficulty completing tasks and following instructions and was not able to pay attention for as long as 20 minutes.  She did not get along well with others, including authority figures, and had been fired from a job due to her inability to get along with co-workers and bosses.  She did not handle stress or changes in routine well. Plaintiff had difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, seeing, using her hands, completing tasks, concentrating, understanding, following instructions, and getting along with others.  In a narrative section, she wrote that her diabetes prevented her from engaging in much activity.  She was unable to stand or walk as a result of pain and swelling in her legs due to neuropathy and she was unable to sit for long periods or lift due to her lumbar spine impairment.  She had anxiety and panic attacks that made it difficult for her to get along with others and she was uninterested in activities due to her depression.  She could not count change and had difficulty learning work routines.  In August 2015, plaintiff listed her medications as insulin and hydrocodone.  In a report completed in November 2015 (Tr. 291-98), plaintiff stated that her doctor had prescribed a third type of insulin to address her diabetes and changed her medications to address increased pain in her legs and feet.  Her mental state was worse as well, she stated, with an increase in her anxiety and

depression.  She wrote that her high blood sugar caused her to pass out and wearing shoes and socks was "unbearable" due to increased pain.  (Tr. 295).   In February 2017, she was taking gabapentin, Valium, iron, vitamin B12, and Excedrin for Headaches in addition to her pain and diabetes medications.  (Tr. 313-14).

Plaintiff testified at the March 2017 hearing that she had surgery on her lumbar spine in November 2016.  (Tr. 42).  Bone was removed from her left hip to create a graft.[4]  (Tr. 52-53).  As a side effect of the surgery, she experienced swelling and pain in her legs and feet.  (Tr. 48-49).  When that happened, she had to lie down for three or four hours.  (Tr. 51-52).  She had just begun a course of injections and aquatic therapy.  (Tr. 42, 48).  Plaintiff testified that she had been unable to afford insulin to treat her diabetes since 2000 and was relying on medication left over from that time.  (Tr. 55-56).  Shortly before the hearing, plaintiff experienced an episode of elevated blood sugars that required emergency intervention.  (Tr. 54).  Plaintiff also testified that her immune system was compromised due to her diabetes and she was unable to fight off colds.  (Tr. 43).  In addition, she had diabetic retinopathy.  (Tr. 49).  Her diabetes had also compromised her bowel and bladder control and on two occasions while shopping at Wal-Mart she was unable to reach the restroom.  (Tr. 49-50).  Her social life was restricted because she wanted to stay close to the bathroom.  She had a partial hysterectomy and tarsal tunnel surgery.  (Tr. 43-44).  In 2012 or 2013, she was diagnosed with cardiac arrhythmia.  Her learning disabilities affected her comprehension and her ability to count money.  (Tr. 44-45).  She was not presently receiving treatment for mental health impairments.  (Tr. 47).  She had occasional migraine headaches.  (Tr. 53).  Plaintiff estimated that she could walk for five to ten minutes and stand for fifteen to twenty minutes before needing to rest.  She could sit for five to ten minutes before she needed to get up

---

[4] The Court has not been able to locate any evidence that a bone graft was performed during plaintiff's discectomy, but the medical record does not include the surgeon's notes from the procedure.

and move around. She could not lift anything heavier than a gallon of milk. (Tr. 47). Cold weather affected her back pain and hot weather affected her diabetes.

Vocational expert Jennifer Smidt was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was able to perform light work, who could never climb ladders, ropes, or scaffolds, could occasionally climb ramps and stairs, and occasionally stoop, kneel, crouch, and crawl. The person needed to work in a temperature-controlled environment, and avoid concentrated exposure to vibration, moving machinery and unprotected heights. Finally, the individual was limited to unskilled work. (Tr. 57-58). According to Ms. Smidt, such an individual would be unable to perform plaintiff's past work as a home health care aide. Other jobs were available in the national economy, such as marker, routing clerk, and photocopy machine operator. (Tr. 58). These jobs would be precluded if the individual were limited to performing sedentary work, but other jobs were available, including callout worker, document preparer, and administrative support worker. All work would be precluded if the individual required occasional unscheduled disruptions of the work day and work week due to pain or an inability to focus. (Tr. 58-59).

### B. Medical Evidence

#### 1. Education Records

Education records from plaintiff's high school show that she had a learning disability in the area of mathematics, with some difficulties with spelling and grammar structure. She had strengths in reading comprehension and organizational skills. She preferred small-group and one-on-one instruction. (Tr. 337). In her senior year, plaintiff successfully passed all regular education classes with additional services from the cross-categorical resource room, using materials from her regular education instructors. (Tr. 335). Testing completed during plaintiff's

sophomore year yielded a Full Scale IQ score of 73, which placed her in the borderline range of intelligence. At the same time, however, she demonstrated above average performance in tests of academic readiness in all areas except mathematics. (Tr. 342-43). Her classroom teachers reported that plaintiff was not a discipline problem, but needed frequent teacher approval. She was "perceived as a liar" because she had "a habit of telling stories . . . that are absolutely false. This behavior may more accurately be described as fantasizing, because she appears to believe" her stories. (Tr. 342).

2.    Medical Records

During the period under review, plaintiff frequently sought treatment from the emergency department of the Poplar Bluff Regional Medical Center. For a period of time, she received primary care services from Chul Kim, M.D., at the Westwood Medical Clinic. In addition, she received services from medical specialists.

Between August and November 2011, plaintiff sought emergency treatment on four occasions for complaints of depression, a small abscess, and abdominal pain. (Tr. 559-61, 552-57, 542-49, 535-40). She had one such visit in 2012 for anxiety. (Tr. 524-33). She sought emergency treatment in July and December 2013 for abdominal pain and depression.[5] She also had elevated glucose levels. (Tr. 490-500, 475-88, 462-68). Imaging completed on December 16, 2013, disclosed chronic cholecystitis. (Tr. 470). On January 30, 3014, plaintiff underwent laparoscopic cholecystectomy and repair of an umbilical hernia. Her glucose level was lower. (Tr. 363-75). At follow up on February 24, 2014, she complained of minimal pain around her umbilical site but was doing well overall and had good resolution of her symptoms. (Tr. 358-

---

[5] On December 31, 2013, plaintiff refused admission to the hospital for further evaluation of her depression. (Tr. 465). She was treated with insulin and Ativan and experienced "marked relief of her symptoms." (Tr. 466).

60). She denied experiencing fatigue, palpitations, back pain or stiffness, incontinence, and joint pain or swelling.

There are no records of further medical care until July 29, 2014, when the car plaintiff was driving was struck on the passenger side. At the emergency department, she complained of pain in her neck and right knee. (Tr. 447-60). On examination, she had limited range of motion of the right knee due to pain. Imaging of the neck, cervical spine, and right knee were unremarkable, with the exception of straightening of the cervical spine. She was discharged with prescriptions for Flexeril and Norco. The record contains no mention of her glucose level. She returned to the emergency department two days later with complaints of continued pain in her neck and right knee. (Tr. 437-45). On examination, she had moderate pain in the neck, right trapezius, and right knee. She was discharged without medication and directed to follow up with her private physician and to return to the emergency department if her condition worsened. On August 15, 2014, she returned to the emergency department for treatment of contact dermatitis. (Tr. 430-34). On examination, she had full range of motion of her neck, a steady gait, and no complaints of musculoskeletal pain. There is no indication that her glucose levels were concerning.

On August 27, 2014, Sonjay Fonn, D.O., of Midwest Neurosurgeons, evaluated plaintiff's complaints of pain in her neck and low back following her car accident in July 2014. (Tr. 622-35). She complained of low back pain that radiated into her right leg with numbness and tingling and pain in her neck with numbness and tingling in her right arm. She also reported that she had a history of irregular heartbeat, poor circulation, swelling in her ankles, varicose veins, headaches, pain in her knees, and depression. On examination, she had no edema or cyanosis, full strength and normal muscle tone, normal gait and station, and her sensory and

neurologic exams were normal. Her mental status examination was normal. Dr. Fonn assessed plaintiff with "signs and symptoms suggestive of lumbar radiculopathy." (Tr. 624).

On September 18, 2014, plaintiff sought treatment at the emergency department for complaints of dizziness and vertigo. (Tr. 421-28). On examination, she had no spinal tenderness and full range of motion of the neck and spine. It was noted that plaintiff's complaints were "out of proportion" to the examination findings. (Tr. 424). She was diagnosed with otitis media and discharged with prescriptions for antihistamines and antibiotics. There was no discussion of elevated glucose levels.

On October 21, 2014, plaintiff sought treatment from Chul Kim, M.D., at the Westwood Medical Clinic. (Tr. 568-70). She complained of low back pain following her July 2014 car accident, nervousness, and hyperglycemia. In addition, she stated that she experienced a racing heart beat and shortness of breath about once a week. Her past medical history included a partial hysterectomy in 2003 and normal 24-holter monitoring and cardiac catheterization in 2007. She denied experiencing tingling, palpitations, back pain, stiffness or limitation in motion. She was taking Humalog and Levemir for her diabetes, and the antidepressant Lexapro. On examination, Dr. Kim noted that plaintiff looked tired. She had tenderness in the upper abdomen and low back. She displayed a normal gait and had no focal deficits. Her mood and affect were normal. Dr. Kim assessed plaintiff with diabetes, anxiety, low back pain, and PSVT.[6] Dr. Kim prescribed Naproxen, hydroxyzine, Celexa, and tramadol. At follow-up in November 2014, plaintiff reported that she was still depressed and stressed, had low back pain and had had three migraine headaches. (Tr. 571-73). Her glucose levels were lower. She also reported that a week

---

[6] Paroxysmal supraventricular tachycardia (PSVT) is episodes of rapid heart rate that start in an area of the heart above the ventricles. https://medlineplus.gov/ency/article/000183.htm (last visited May 15, 2019).

earlier she had sought treatment for back pain at the emergency department where she was given Norco without benefit. On examination, Dr. Kim noted that plaintiff appeared well and was not in distress. With the exception of tenderness to the low back, her examination was unremarkable. Plaintiff was encouraged to exercise and was prescribed gabapentin, Flexeril, and hydrocodone. In December 2014, plaintiff reported that she had pain in both feet with numbness in her big toes, pain in her right upper abdomen after meals, and nervousness due to stress. (Tr. 574-76). On examination, she looked tired and had tenderness in her low back. Her mood, affect, gait, and extremities were all normal. Dr. Kim added diabetic peripheral neuropathy to plaintiff's problem list and prescribed hydroxyzine,[7] increased plaintiff's gabapentin, and encouraged her to diet and exercise. There is no indication of what her glucose levels were.

On January 20, 2015, plaintiff went to the emergency department seeking treatment for an upper respiratory infection and bronchitis. (Tr. 414-19). She reported that she was seen the previous day at another emergency room. On examination, as relevant here, she was not in acute distress, had full range of motion of the neck, and had no cardiovascular or respiratory symptoms. She was given prescriptions for an antibiotic and cough syrup with codeine. There is no mention of elevated glucose levels. The following day, plaintiff told Dr. Kim that she had been sick for four days. (Tr. 577-79). She reported home glucose levels of 301 and 181. Dr. Kim noted that plaintiff looked weak and tired and was coughing but her examination was otherwise unremarkable. She was given the antibiotic Zithromax.

On February 23, 2015, plaintiff told Dr. Kim that her prescriptions for Norco and gabapentin were not addressing her low back pain and neuropathy symptoms. (Tr. 580-82). She also reported occasional palpitations. On examination, she did not appear in distress, her spine

---

[7] Hydroxyzine is an antihistamine that can be used to relieve anxiety and tension. See https://medlineplus.gov/druginfo/meds/a682866.html (last visited May 15, 2019).

was normal without deformity or tenderness, and she had a normal range of motion.  Dr. Kim prescribed increased dosages of plaintiff's Norco and gabapentin.  He noted that she had not had the A1C blood test[8] for two years.

On March 10, 2015, plaintiff went to the emergency department after experiencing numbness in her face while exercising.  (Tr. 401-12).  On examination, she was not in acute distress and had full range of motion of the neck and spine, without tenderness.  Her mental status was normal.  A CT scan of the head and brain was normal, while a CT scan of the cervical spine disclosed straightening of the cervical lordosis without significant listhesis.  She was discharged with a prescription for the steroid Medrol.  There was no discussion of her glucose levels.

On March 24, 2015, plaintiff told Dr. Kim that her low back pain persisted.  (Tr. 583-85).  In addition, she had woken up with abdominal pain and nausea twice in the last week and had painful swelling in both legs for more than 10 days.  She also reported palpitations, diarrhea, nervousness, and depression.  Her home glucose level was 100.  On examination, she appeared well and was in no distress, with normal mood and affect.  She did not display edema, clubbing, or cyanosis of the extremities.  Dr. Kim added diarrhea following cholecystectomy to plaintiff's problem list, but noted that she did not want medication for this condition.  Dr. Kim increased the dosage of plaintiff's Celexa and added the diuretic Lasix and potassium.

Plaintiff went to the emergency department on April 14, 2015, with complaints of moderate back pain.  (Tr. 394-99).  On examination, she was not in acute distress.  She had moderate back pain with motion, although straight leg raises did not elicit pain.  X-rays disclosed

---

[8] The A1C test (or HBA1C)  provides information about a patient's average levels of blood glucose over a 3- month period and is the primary test for diabetes management.  See https://www.niddk.nih.gov/health-information/diabetes/overview/tests-diagnosis/a1c-test (last visited May 22, 2019).

a normal lumbar spine.  She was treated with Percocet and released.  There was no discussion of her glucose levels.  The following day, she told Dr. Kim that she had fallen at home, causing back pain, a headache, and blood in her urine.  Her home glucose the night before was 226.  (Tr. 586-88).  The Percocet she received at the emergency room caused nausea and vomiting.  On examination, Dr. Kim noted that plaintiff appeared tired and would not smile.  She had tenderness in her neck, low back, and right flank.  Dr. Kim added postcholecystectomy syndrome to plaintiff's problem list and prescribed Tramadol for pain and Phenergan for nausea. Less than a week later, plaintiff told Dr. Kim that her low back pain was worse and she had dizziness.  (Tr. 589-91).  She wanted a CT scan of her head.  She reported that she had had chest pain at night and home glucose levels of  338 and 256.  On examination, Dr. Kim noted that plaintiff was not in apparent distress and had normal mood and affect.  With the exception of tenderness in the epigastric abdomen and low back, her physical findings were normal.  Dr. Kim directed plaintiff not to take Naproxen every day and prescribed omeprazole for her nausea.

Plaintiff was seen by Dr. Kim eight times between June 2015 and February 2016.  (Tr. 592-94, 595-97, 603-05, 606-08, 609-11, 612-14, 615-18, 619-21).  During that time, she continued to complain of pain in her low back, hands, arms, legs, and feet and reported glucose levels between 277 and 600.  In June, Dr. Kim prescribed Ambien and Wellbutrin.  At her next visit in July, Dr. Kim discontinued them because plaintiff could not afford them and substituted trazodone.  Plaintiff looked tired at that visit and had tenderness in the right lower quadrant and low back.  Her presentation was much the same in September.  In October, plaintiff reported that her feet hurt all the time.  Dr. Kim prescribed the cholesterol-lowering agent Questran Lite and ordered blood work.  Plaintiff reported at the next office visit that she could not afford the blood tests.  Dr. Kim urged her to at least complete the HBA1C test for her diabetes.  There is no

indication that she followed through. In November, Dr. Kim increased the dosage of plaintiff's gabapentin and added Tanzeum to treat her diabetes. In December 2015, plaintiff complained of continued depression with fatigue, weakness, and chest pain following her grandfather's recent suicide. She also had an infected toe. Dr. Kim prescribed the antidepressant Paxil and an antibiotic. In January 2016, plaintiff reported that her feet were less painful, but she continued to have low back pain and depression. Dr. Kim increased the Paxil dosage. In February 2016, plaintiff reported that Humalog — a drug she had been taking throughout the period under review to control her diabetes — made her sick. There are no further medical records from Dr. Kim.

In February 2016, ophthalmologist Kylie Divine, O.D., diagnosed plaintiff with astigmatism and mild nonproliferative diabetic retinopathy.[9] She was prescribed contact lenses to correct her vision and directed to return in three months for further monitoring. (Tr. 661-64, 665-67).

Between May 2016 and January 2017, plaintiff received extensive treatment for her lumbar spine. An MRI in May 2016 disclosed disc bulge changes consistent with annular tears, particularly at the L5-S1 level. (Tr. 670). In July 2016, plaintiff had three rounds of bilateral epidural steroid injections at L4-L5. (Tr. 688, 689, 670). A nerve conduction study in August 2016 disclosed right and left tarsal tunnel syndrome and bilateral L5/S1 radiculopathy, while an electromyography of the legs showed no abnormalities. Myelogram and discogram studies of the lumbar spine completed in September 2016 showed a broad-based disc bulge at L4-L5 with moderate foraminal stenosis, abnormal disc contours with extravasation at L4-L5 and L5-S1,

---

[9] Mild nonproliferative retinopathy is the earliest stage of diabetic retinopathy and is characterized by microaneurysms that may leak fluid into the retina. See https://nei.nih.gov/health/diabetic/retinopathy (last visited May 22, 2019).

consistent with annular tears and possible fissure formation of the disc at L2-L3. (Tr. 670). Dr. Fonn diagnosed plaintiff with lumbar radiculopathy, lumbago, lumbar herniation of the nucleus pulposus without myelopathy, lumbar spondylosis without myelopathy, and sciatica. Id. He proposed that plaintiff undergo a posterior lumbar interfusion at the L4-L5 and L5-S1 levels.

In October 2016, plaintiff complained of pain in her low back and hip, with paresthesia and weakness in her toes and numbness in her right foot. (Tr. 672-74). She rated her pain at level 10 on a 10-point scale. On examination, she was awake, alert and oriented, with intact memory and attention, fluent speech, and a good fund of knowledge. She had full motor strength throughout, with normal gait and station, normal tone, and intact sensation and reflexes. Straight leg raising was negative. No work restrictions were imposed.

On November 17, 2016, Dr. Fonn performed a posterior lumbar interbody fusion at L4-L5 and L5-S1. (See Tr. 677). A CT scan of the lumbar spine taken on December 1, 2016, showed that plaintiff was developing intraspinal calcification. (Tr. 698). In January 2017, plaintiff continued to rate her pain at level 10. (Tr. 677-79). By contrast with that rating, she reported that she had achieved at least 50 percent relief of her symptoms, with her back pain resolved except for surgical pin at the incision site. She reported that she still had edema with pain in both legs. She was continuing to wear a back brace. On examination, she had full strength and normal tone and demonstrated normal gait and station. Her sensation was intact and straight leg raising was negative. Her memory was intact and she had a good fund of knowledge. It was Dr. Fonn's assessment that the surgery successfully treated plaintiff's lumbar radiculopathy, lumbago, and sciatica. Plaintiff was advised to continue wearing a brace and to return for scheduled postoperative visits. Once again, no work restrictions were imposed.

On January 20, 2017, plaintiff sought emergency treatment for redness and pain of her left toe which she rated at level 10 on a 10-point pain scale. (Tr. 783-802). She was diagnosed with cellulitis and prescribed an antibiotic. There is no mention that she had elevated glucose levels. On February 8, 2017, she sought treatment for a fever blister on her lip that she again rated at level 10. Again, there is no discussion of her glucose levels. (Tr. 768-81). On February 23, 2017, x-rays and CT scans of the lumbar spine showed no evidence of migration and revealed a stable fusion from L4 to S1. (Tr. 686-87).

On February 27, 2019, plaintiff sought emergency care for elevated blood sugar and back pain that she rated at level 8. (Tr. 750-66). She reported a home glucose level of 430 but tested at 369 in the emergency department. On examination, she was not in apparent distress and was cooperative. Less than an hour after her arrival, she reported that she was not in any pain. She was assessed with hypoglycemia and discharged. She returned to the emergency department on March 16, 2017, complaining of elevated blood sugar and weakness. (Tr. 724-48). She also complained of pain in her back that radiated to her left leg. She did not appear to be in distress. Her glucose level in the emergency room was 332. She was administered IV insulin and discharged in stable condition.

### 3. Opinion evidence

On September 11, 2015, State agency medical consultant Mel Moore, M.D., completed a Physical Residual Functional Capacity Assessment based on a review of the record. (Tr. 75-78). Dr. Moore concluded that plaintiff could occasionally lift and/or carry up to 20 pounds and frequently lift and/or carry up to 10 pounds; could walk and/or stand for 6 hours in an 8-hour workday and sit for 6 hours; frequently climb stairs or ramps, balance or stoop, occasionally climb ladders or scaffold, and was unlimited in her capacity to kneel, crouch and crawl. Due to

her diabetes and neuropathy, she should avoid concentrated exposure to extreme temperatures, vibration, and workplace hazards. The ALJ gave Dr. Moore's opinion great weight as consistent with the medical evidence but gave plaintiff the benefit of the doubt and found that plaintiff's residual functional capacity was slightly more restrictive. (Tr. 24-25). In her reply brief, plaintiff challenges the ALJ's reliance on Dr. Moore's opinion as inconsistent with her back impairments. [Doc. # 21 at 5].

State agency psychological consultant Robert Cottone, Ph.D., completed a Psychiatric Review Technique form based on a review of the record. (Tr. 73-75). Dr. Cottone concluded that plaintiff had medically determinable impairments in the categories of 12.02 (organic mental disorders), 12.04 (affective disorders), and 12.06 (anxiety-related disorders). He noted that, while plaintiff had sought emergency treatment for anxiety, she had not alleged panic attacks and her anxiety improved with low doses of Celexa. She had not sought mental health treatment and had no hospitalizations for mental health conditions. With respect to her learning disabilities, Dr. Cottone noted that plaintiff graduated from high school, had a driver's license,[10] and was routinely assessed as having intact memory and normal insight and judgment. He found that plaintiff had moderate limitations in her abilities to understand, remember, and carry out detailed instructions; complete a normal work schedule without interruptions and perform at a consistent pace; interact appropriately with the general public and get along with coworkers; and respond appropriately to changes in the work setting and set realistic work goals or work independently. (Tr. 78-80). Dr. Cottone opined that plaintiff should avoid work involving intensive or extensive interpersonal interaction, handling customer complaints, and close proximity to co-workers. She had the capacity to understand, remember, carry out, and persist at simple tasks, make simple

---

[10] Plaintiff testified at the hearing that she did not have a driver's license, but evidence in the record shows she was driving when she was involved in the July 2014 accident. (Tr. 46, 448).

judgments, relate adequately with coworkers and supervisors, and adapt adequately to routine changes in the work routine or setting. The ALJ gave this opinion great weight as well supported by medical evidence, internally consistent, and not contradicted by any objective findings.[11] (Tr. 25). In her reply brief, plaintiff asserts that Dr. Cottone's opinion is inconsistent with her intellectual functioning and fails to take into account the side effects of her medications. [Doc. # 21 at 5].

The ALJ noted that Dr. Fonn opined that plaintiff did not have any work restrictions. The ALJ gave this opinion great weight, noting that Dr. Fonn was a treating physician and his treating notes were consistent with the objective evidence as a whole and supported by medically acceptable clinical and laboratory techniques. (Tr. 25).

### III.  Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act. See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

---

[11] Despite giving Dr. Cottone's opinion great weight, the ALJ did not include in the RFC a restriction on plaintiff's interaction with others. The exclusion of this restriction is consistent with the ALJ's finding elsewhere in the decision that plaintiff had no limitation in her abilities to interact independently, appropriately, effectively, and on a sustained basis with other people; get along with co-workers; respond appropriately to supervision; maintain socially appropriate behavior; and adhere to basic standards of neatness. (Tr. 20). The ALJ supported this finding by citing plaintiff's reports that she shopped in stores once a month for five hours, socialized with family at the dinner table, and visited with friends who came to visit her. Plaintiff does not raise an allegation of error based on the ALJ's failure to specifically address Dr. Cottone's opinion that plaintiff should avoid intensive or extensive interpersonal interaction, handling customer complaints, and close proximity to co-workers. The Court finds that the omission is merely a defect in opinion writing and not a basis for rejecting the ALJ's decision. See Johnson v. Apfel, 240 F.3d 1145, 1149 (8th Cir. 2001) (deficiency in ALJ's "opinion-writing technique does not require this Court to set aside a finding that is supported by substantial evidence.").

expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC

to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole.  Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).  In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision.  Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider).  Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance.  Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining

that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV.  The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above.  (Tr. 15-28).  The ALJ found that plaintiff had not engaged in substantial gainful activity since January 1, 2013, the alleged onset date.[12]  (Tr. 18).  At steps two and three, the ALJ found that plaintiff had the following severe impairments:  diabetes mellitus, degenerative disc disease, degenerative joint disease, neuropathy, history of learning disorder, and headaches.  The ALJ found that plaintiff's allegations of immune system disorder, cardiac disorder, and hernia pain were not medically determinable.  The ALJ next determined that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[13]  (Tr. 14).  Plaintiff does not challenge the ALJ's determination of her severe impairments.

The ALJ next determined that plaintiff had the RFC to perform sedentary work but could never climb ladders, ropes, and scaffolds.  She could occasionally kneel and stoop, and never

---

[12] The ALJ also found that plaintiff met the insured status requirements through September 30, 2016.  (Tr. 18).

[13] The ALJ considered the listings for disorders of the spine (listing 1.04), major dysfunction of a joint (listing 1.02), and disorganization of motor function (listing 11.14).  (Tr. 19).  The ALJ also considered the symptoms caused by diabetes mellitus under these listings and found that plaintiff had not exhibited any symptoms or complications resulting from diabetes that would meet the listing requirements.  Id. (citing listing 9.00B5).  With respect to plaintiff's alleged mental disorders, the ALJ analyzed the "paragraph B" criteria for Listing 12.02 (organic mental disorders) and found that plaintiff had moderate restriction in the functional are of understanding, remembering or applying information; no restriction in the ability to interact socially; moderate restriction in sustaining concentration, persistence, and pace; and no restrictions in adapting to change and managing oneself.  (Tr. 20).  Plaintiff also did not meet the "paragraph C" criteria.  Id.

crouch or crawl. She should avoid concentrated exposure to unprotected heights, excessive vibration, and hazardous machinery and should work in a temperature-controlled environment. Finally, she was limited to performing unskilled work. (Tr. 21-26). In assessing plaintiff's RFC, the ALJ summarized the medical record, as well as plaintiff's written reports and testimony regarding her abilities, conditions, and activities of daily living. While the ALJ found that plaintiff's severe impairments could reasonably be expected to produce some of the alleged symptoms, the ALJ also determined that plaintiff's statements regarding the intensity, persistence and limiting effect of her symptoms were "not entirely consistent with" the medical and other evidence. (Tr. 25-26). The ALJ found that plaintiff's daily activities were not limited to the extent one would expect, given her complaints of disabling symptoms and limitations. In addition, the medical evidence did not entirely support plaintiff's allegations regarding her impairments. Her back surgery suggested that her symptoms were genuine, but the surgery was generally successful in relieving her symptoms. And, while medical evidence established that plaintiff sought treatment for her alleged health issues, the medical findings did not support her allegation that she was unable to work. Id.

At step four, the ALJ concluded that plaintiff was unable to return to any past relevant work. Id. Her age on the alleged onset date placed her in the "younger individual" category. She had at least a high school education and was able to communicate in English. Id. The transferability of job skills was not an issue because using the Medical-Vocational Rules as a framework supported a finding that plaintiff was not disabled whether she had transferable job skills or not. The ALJ found at step five that someone with plaintiff's age, education, work experience, and residual functional capacity could perform other work that existed in substantial numbers in the national economy, namely as a call out operator, a document preparer, and an

administrative support worker. (Tr. 26-27). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from January 1, 2013 — the alleged onset date — through September 7, 2017 — the date of the decision. (Tr. 27-28).

## V. <u>Discussion</u>

It is difficult to discern specific allegations of legal error amidst plaintiff's general complaint that there is no work that she can do. She points out that her medical condition has only worsened since the ALJ's decision was issued, but acknowledges that the Court is bound by the evidence in the record for the period under review. Defendant addresses plaintiff's arguments as challenges to (1) the ALJ's assessment of plaintiff's subjective complaints in formulating the RFC, and (2) the ALJ's determination that plaintiff retained the RFC to perform other work available in the national economy.[14] The Court agrees that this is a reasonable construction of plaintiff's arguments.

### A. Plaintiff's Subjective Complaints

In arguing that the ALJ improperly found that she is capable of performing gainful employment, plaintiff relies primarily on her subjective complaints.

In evaluating a claimant's subjective complaints,[15] the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating

---

[14] The Court notes that, for the first time in her reply brief, plaintiff challenges the ALJ's reliance on the opinions of nonexamining State agency consultants. [Doc. # 21 at 4-5]. "As a general rule, [the Court] will not consider arguments raised for the first time in a reply brief." <u>Barham v. Reliance Standard Life Ins. Co.</u>, 441 F.3d 581, 584 (8th Cir. 2006). Furthermore, plaintiff's argument is based on her subjective complaints which, as discussed below, the ALJ properly discounted. Furthermore, no treatment provider or medical examiner ever stated that plaintiff was unable to work due to her impairments. Thus, plaintiff would not prevail on her challenge to the ALJ's assessment of opinion evidence, even if properly raised.

[15] For decisions made on or after March 28, 2016, Social Security Ruling 16-3p eliminates the term "credibility" from the analysis of subjective complaints, clarifying that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2017 WL 5180304, at *2 (Soc. Sec. Admin. Oct. 25, 2017 (republished)). The factors to be considered in evaluating a claimant's statements,

and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ must acknowledge and consider the Polaski factors before discounting a claimant's subjective complaints, the ALJ "need not explicitly discuss each Polaski factor." Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (quoting Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)). An ALJ may discount a claimant's complaints if there are inconsistencies in the record as a whole, and the courts "will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." Wildman, 596 F.3d at 968 (quoting Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007)). "The ALJ is in a better position to evaluate credibility, and therefore we defer to her determinations as they are supported by sufficient reasons and substantial evidence on the record as a whole." Andrews v. Colvin, 791 F.3d 923, 929 (8th Cir. 2015); see also Julin v. Colvin, 826 F.3d 1082, 1086 (8th Cir. 2016) (court defers to ALJ's determinations "as long as good reasons and substantial evidence support the ALJ's evaluation of credibility.").

Here, the ALJ considered plaintiff's daily activities, which included self-care, preparing meals, watching television, "reading all the time," completing laundry with her fiancé's help, washing dishes, grocery shopping, and socializing with others. The ALJ found that these activities were not limited to the extent one would expect, given her complaints of disabling symptoms and limitations. (Tr. 25). Plaintiff does not directly address the ALJ's assessment of her daily activities.

---

however, remain the same. See id. at *13 ("Our regulations on evaluating symptoms are unchanged."); see also 20 C.F.R. §§ 404.1529, 416.929.

The ALJ also found that the medical evidence in the record did not entirely support plaintiff's allegations regarding her physical and mental impairments. (Tr. 25-26). On examination, plaintiff consistently had full strength, good range of motion, intact sensation, normal reflexes and muscle tone, and normal gait and station. There are no documented instances of edema, clubbing, cyanosis, or atrophy. As the ALJ acknowledged, plaintiff alleged disabling back pain. She underwent surgery, however, which she reported resolved her symptoms with the exception of surgical pain at the incision site. (Tr. 677-79). Although plaintiff testified that her surgeon restricted her to lifting no more than a gallon of milk, the medical record does not include that limitation. Indeed, her surgeon released her without work restrictions. Subjective complaints may be discounted if the claimant's testimony is inconsistent with the evidence as a whole. See Nash v. Comm'r, Soc. Sec. Admin., 907 F.3d 1086, 1090 (8th Cir. 2018) (ALJ did not err in rejecting limitations supported only by claimant's testimony).

Plaintiff asserts here that she unable to work due to dizziness and an inability to think clearly, caused by her long history of elevated blood sugar[16] and medications. [Doc. # 15 at 10]. The medical record shows that she complained of dizziness on only two occasions — in September 2014[17] and April 2015. (Tr. 421-28, 589-91). No medical provider ever observed that she was unsteady on her feet. Plaintiff's allegations of disabling cognitive symptoms caused by her medications or diabetes are also not supported by the medical records.[18] She routinely had normal mental status, with intact memory, judgment, and insight. The record does establish

---

[16] In her brief, plaintiff refers to elevated blood pressure. Plaintiff did not allege that she had high blood pressure nor is there any indication that she was ever treated for this condition and so the Court assumes that she means to refer to elevated blood sugar.

[17] On this occasion, she had an ear infection.

[18] Plaintiff testified that she was prescribed Valium. (Tr. 55). The Court has not located any prescription for Valium in the medical record.

that plaintiff had diabetic neuropathy, but her symptoms improved once her gabapentin was increased. (Tr. 615-18). "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) (citation omitted). She testified that her immune system was damaged by diabetes and that she had colds that lasted several weeks. (Tr. 43). By contrast with her testimony, the record reflects that she had an upper respiratory infection on one occasion, in January 2015. (Tr. 414-19, 577-79). Plaintiff was diagnosed with mild nonproliferative diabetic retinopathy in February 2016, which required ongoing monitoring but was not described as limiting her activities in any way. (Tr. 665-67). Plaintiff testified that her pancreas was affected by her diabetes, but there is no evidence that she was diagnosed with or treated for pancreatic dysfunction. After her gallbladder was removed in January 2014, she continued to have complaints of abdominal pain that was diagnosed as postcholecystectomy syndrome but she rarely displayed abdominal tenderness on examination. (See Tr. 596 — tenderness in right lower quadrant). Plaintiff did complain of diarrhea on occasion, but declined a prescription to treat it. (Tr. 585). A failure to follow a recommended course of treatment also weighs against a claimant's credibility. Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (noting that claimant "did not take advantage" of physician's offer to refer him to specialist).

Plaintiff argues that she is a victim of being unable to afford medical treatment of her diabetes. She testified that she had not bought any insulin since 2000 and was relying on supplies she kept after her son was born in 2000. (Tr. 55-56). This testimony is at odds with medical records which show that she was repeatedly prescribed medications to control her glucose levels and the reports she submitted in support of her claim for benefits in which she listed glucose-controlling medicines. And, she never informed Dr. Kim that she was unable to

afford these medications, while she did tell him that she was unable to afford other medications and treatments.  (Tr. 595-97, 609-11).

Plaintiff complains that her mental impairments are incompatible with work.  As noted, her mental status evaluations generally indicated normal mood and affect, normal insight and memory, and a good fund of knowledge.  She occasionally presented with depressed or anxious mood (Tr. 464), but there is no evidence in the medical record that she complained of more debilitating symptoms, such as suicidal ideation or poor sleep or appetite.  (Tr. 464).  Plaintiff also states in her brief that she cannot read on a functional level.  [Doc. # 15 at 10].  This assertion is at odds with the education records, which showed reading was an area of strength, and her own report that she "reads all the time."

The Court finds that the ALJ's evaluation of plaintiff's subjective complaints is supported by substantial evidence in the record as a whole.

### B.    The RFC Determination and Ability to Perform Other Work

"[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations."    Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quotation and citation omitted).  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007).  Nevertheless, the ALJ is not limited to considering only medical evidence in evaluating a claimant's RFC.  Id.; see also Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved *only* by medical evidence, we disagree.") (emphasis in original).  When evaluating the RFC, an ALJ "is not limited to considering medical evidence

exclusively," but may also consider a claimant's daily activities, subjective allegations, and any other evidence of record. Hartmann v. Berryhill, No. 4:17-CV-002413-SPM, 2018 WL 4679737, at *6 (E.D. Mo. Sept. 28, 2018) (citing Cox, 495 F.3d at 619-20). Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox, 495 F.3d at 620; 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006). The burden is on the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523.

Here, after summarizing the evidence in the record and evaluating plaintiff's subjective complaints, the ALJ determined that plaintiff had the RFC to perform unskilled, sedentary work with some additional postural and environmental limitations. This RFC is supported by substantial evidence in the record as a whole.

The vocational expert testified that an individual with this RFC could not perform plaintiff's past relevant work. At that point, the burden shifted to the Commissioner to establish that plaintiff maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f). "The Commissioner may rely on a vocational expert's response to a properly formulated hypothetical question to meet her burden of showing that jobs exist in significant numbers which a person with the claimant's residual functional capacity can perform." Gann v. Berryhill, 864 F.3d 947, 952 (8th Cir. 2017) (citation omitted). A hypothetical question need only include the impairments and limitations that the ALJ finds are credible and substantially supported by the record as a whole. Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006) ("The ALJ's hypothetical question to the vocational expert needs to include only those

impairments that the ALJ finds are substantially supported by the record as a whole.");
Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

Here, the vocational expert testified that an individual with plaintiff's age, education, vocational history, and RFC could perform other work existing in significant numbers, including call-out operator, document preparer, and administrative support person.  The vocational expert also testified that there would not be work available if the hypothetical individual additionally needed occasional unscheduled disruption of the work schedule in order to sit or lie down for extended periods, or was unable to focus or concentrate for a full eight-hour work day, or could not reliably show up for work.  (Tr. 59).  Plaintiff states that the evidence establishes that this latter hypothetical most accurately describes her limitations.  As discussed above, however, the ALJ properly discounted plaintiff's assertion that she was limited to the degree reflected in this final hypothetical.

The Court finds that the ALJ's hypothetical to the vocational expert accurately reflected plaintiff's limitations and impairments as supported by evidence in the record as a whole.  Thus, the vocational expert's testimony constitutes substantial evidence that plaintiff can perform work that exists in substantial numbers in the economy and plaintiff was not under a disability at any time through the date of the ALJ's decision.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's decision is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of June, 2019.